THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK A. CAMPOBELLO, Defendant (The Catholic Diocese of Rockford, Contemnor-Appellant).

Second District    No. 2—03—0725

Opinion filed May 21, 2004.

620

Stephen R. Swofford, Joshua G. Vincent, and Ellen B. Lynch, all of Hinshaw & Culbertson, of Chicago, for appellant.

Meg Gorecki, State's Attorney, of St. Charles (Martin P. Moltz and Sally A. Swiss, both of State's Attorneys Appellate Prosecutor's Office, of counsel), and Kristine A. Karlin, of Mt. Prospect, for the People.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

The Roman Catholic Diocese of Rockford (Diocese) appeals the judgment of the circuit court holding the Diocese in contempt of court for refusing to comply with a discovery order requiring the Diocese to produce certain documents in its possession. We affirm the underlying discovery order, vacate the contempt order, and remand for further proceedings consistent with this opinion.

The State brought sexual assault charges against defendant, Mark A. Campobello, alleging that he molested a young girl while acting in a

position of trust as her priest in the Roman Catholic Church (Church). The State served the Diocese with a subpoena for "any and all records regarding [defendant]," including "Personnel Files, Transfer Record, Intervention Team Records, Misconduct Officer Records, Placement at St. Luke's in Maryland, and Records kept pursuant to Canon 489." The Diocese moved to quash the subpoena on various grounds. As we describe below, the State clarified the scope of its subpoena at the hearing on the Diocese's motion to quash.

The Diocese attached to its motion the affidavit of Monsignor David Kagan, who explained the Church's procedures for investigating allegations of sexual misconduct against clergy members. In September of 1995, the Diocese adopted as canon law a document entitled, "Sexual Misconduct With Minors: Norms for Education, Prevention, Assistance to Victims and Procedures for Determination of Fitness For Ministry/Employment" (Norms). The Norms established the position of Diocesan misconduct officer, as well as the Diocesan intervention committee (or "intervention team," as the State calls it in certain pleadings). The functions of the misconduct officer are to investigate allegations of sexual misconduct by Church priests and laity and to report findings to the intervention committee, which is comprised of 16 members, including both Church laity and clergy, who are appointed by the Diocesan bishop. According to Monsignor Kagan, the members of the intervention committee, while acting in their official capacity, "are equivalent to practitioners accredited by the Roman Catholic Church" because they perform duties prescribed by the Diocese. After reviewing the information provided by the misconduct officer, the intervention committee recommends to the bishop whether the clergy or lay member under investigation should remain employed by the Church or should at least be removed from active ministry.

Monsignor Kagan explained that the United States Conference of Bishops adopted a "Charter for the Protection of Children and Young People" (Charter) in 2002. The Charter mandates that each diocese have a review board that functions as a confidential consultative body to the diocesan bishop to advise and assist him with respect to allegations of sexual abuse by clergy and laity and to the suitability for continued ministry of persons accused of such misconduct. Monsignor Kagan asserted that the Diocese's intervention committee and misconduct officer fulfill the requirements of the Charter.

Monsignor Kagan averred that the records generated by the misconduct officer and the intervention committee contain the "religious thoughts and ideas of members of the Church" concerning "whether violations of canonical law occurred and, if so, how such violations should be addressed and remedied" in accord with canon law. The

Norms require that information generated by the misconduct officer and the intervention committee be kept confidential. Canon 489 of the Church's code of canon law requires the diocesan bishop to maintain an archive of documents relating to internal Church discipline of clergy. The archive is to be "secret," with the diocesan bishop alone having access. Monsignor Kagan averred that the confidentiality of misconduct officer and intervention committee records encourages the free flow of information because "individuals with knowledge of misconduct would be less likely to come forward to report such acts if they thought the information would not be kept private."

Monsignor Kagan averred that in October 2002, while he was serving as misconduct officer, he and the intervention committee generated documents regarding defendant. Monsignor Kagan further averred that the documents he generated in the course of the investigation were "the result of communications made to [him] in [his] capacity as priest."

At the hearing on the Diocese's motion to quash, the State clarified that its subpoena covered: (1) defendant's personnel files, (2) transfer records reflecting defendant's various parish assignments within the Church, (3) misconduct officer and intervention committee records of investigations within the Church of allegations of impropriety against defendant, and (4) reports indicating why the Diocese had defendant admitted to St. Luke's Hospital, a mental health facility in Maryland. The State emphasized that it was not seeking "actual mental health records," such as "psychological tests" or "statements [defendant] made to a therapist." The State explained:

"MS. GLEASON [Assistant State's Attorney]: Your Honor, \*\*\* the State certainly believes we would have a right to records, if there were any records, which would indicate that the Diocese sent [defendant] to St. Luke's because they were aware of some kind of sexual misconduct with a child.

So if there is a report that, you know, so-and-so said that there was some kind of sexual misconduct with a child and then they took the action and said, 'therefore we are sending him to St. Luke's,' I think I would be entitled to that; but I'm not saying that we are entitled to any kind of records from St. Luke's regarding mental health."

Specifically, the State sought any "report" indicating why defendant was placed at St. Luke's for mental health treatment, including "notes or records of communications between the hospital and the Diocese regarding the reasons for [defendant]'s admission." With respect to the request for records of the Diocese's internal investigation, the State emphasized that it was not seeking "defendant's admissions in a priest/penitent situation."

The Diocese argued that records indicating the reasons for defendant's admission to St. Luke's were privileged from disclosure under the Mental Health and Developmental Disabilities Confidentiality Act (Confidentiality Act) (740 ILCS 110/1 *et seq.* (West 2002)). The Diocese also claimed that it was protected against compelled disclosure of the records of its internal investigation by the religion clauses of the first amendment to the United States Constitution (U.S. Const., amend. I) and by the clergy member privilege (735 ILCS 5/8—803 (West 2002)). The Diocese also urged the trial court to recognize a "critical self-analysis" privilege under Illinois law and hold that the privilege protected the Diocese's records of its investigation.

The trial court issued a written order disposing of all issues. Therein, the trial court ordered the Diocese to provide the State all personnel files and transfer records relating to defendant. The trial court added that the State had agreed that "mental health records" in the possession of the Diocese are protected by the Confidentiality Act. The trial court quashed the State's subpoena to the extent that it covered "mental health records protected under [the Confidentiality Act]." However, the trial court ordered the Diocese to produce for *in camera* inspection all records concerning defendant's "placement at St. Luke's in Maryland."

The trial court rejected the Diocese's argument that the religion clauses of the first amendment prohibited compelled disclosure of the records of the Diocese's internal investigation of defendant. Regarding the Diocese's claim of protection under the clergy member privilege, the trial court adopted the following remarks from the Pennsylvania Superior Court in the case of *Hutchison v. Luddy*, 414 Pa. Super. 138, 146-47, 606 A.2d 905, 909 (1992):

> "This privilege protects 'priest-penitent' communications; it does not protect information regarding the manner in which a religious institution conducts its affairs or information acquired by a church as a result of independent investigations not involving confidential communications between priest and penitent."

The trial court also held that the clergy member privilege applies to statements made by a party to a clergy member on a "one-to-one" basis, not to statements made "before a panel or group." Finally, the trial court rejected the argument that the records of the internal investigation of defendant were protected by a "critical self-analysis" privilege. The trial court ordered the Diocese to produce all records of the internal investigation of defendant for *in camera* inspection to determine whether the records are protected by the clergy member privilege.

The Diocese's attorney represented to the court that the Diocese

did not intend to comply with the discovery order and respectfully requested a contempt order. The court entered such an order, from which the Diocese appeals.

■ Generally, nonfinal discovery orders are not appealable. *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001). However, it is well settled that the correctness of a discovery order may be tested through contempt proceedings. *Norskog*, 197 Ill. 2d at 69. A pretrial discovery order is subject to appellate review when a party appeals a contempt sanction for refusing to comply with the order. *Norskog*, 197 Ill. 2d at 69.

■ The standard of review applicable to a discovery order depends on the nature of the question answered in the trial court. *Norskog*, 197 Ill. 2d at 70. The Diocese challenged the subpoena on grounds of privilege and constitutionality. Constitutional interpretations are reviewed *de novo* (*Quantum Pipeline Co. v. Illinois Commerce Comm'n*, 304 Ill. App. 3d 310, 314 (1999)), as are questions about the applicability of discovery privileges (*Berry v. West Suburban Hospital Medical Center*, 338 Ill. App. 3d 49, 53 (2003)).

■ We address first the applicability of the Confidentiality Act to the State's discovery requests. Section 3(a) of the Confidentiality Act (740 ILCS 110/3(a) (West 2002)) provides that "[a]ll records and communications shall be confidential and shall not be disclosed except as provided in this Act." Section 10 the Confidentiality Act (740 ILCS 110/10 (West 2002)) provides in relevant part:

> "(a) Except as provided herein, in any civil, criminal, administrative, or legislative proceeding, or in any proceeding preliminary thereto, a recipient, and a therapist on behalf and in the interest of a recipient, has the privilege to refuse to disclose and to prevent the disclosure of the recipient's record or communications."

The parties agree that none of the exceptions of section 10 apply. They disagree over whether the records the State seeks are "records" or "communications" protected by the Confidentiality Act and whether defendant, as "recipient" of mental health services, has exercised his privilege under section 10 to refuse to disclose such "records" or "communications."

We do not reach these questions. The State agreed that it was not entitled to any "mental health" records protected by the Confidentiality Act, and the trial court quashed the subpoena insofar as it covered such records. As for the records concerning the reasons for defendant's placement at St. Luke's, the trial court has not yet ruled whether they are privileged under the Confidentiality Act. The trial court will make that determination after it views the records *in camera*.

We recognize that, when the trial court announced its written decision on the record, it said:

"The sum and substance of the ruling is that I denied the motion to quash, but I will review the discovery *in camera*, and I will separate anything that is irrelevant from the things that are relevant and then tender the relevant material. That is the sum and substance."

The trial court's announced intention of reviewing the documents for relevancy does not imply that it had already ruled that the documents concerning the reasons for defendant's placement at St. Luke's are not privileged and that relevancy was the only standard to be applied during the *in camera* inspection. In its written order, the trial court granted the motion to quash with respect to all mental health records protected under the Confidentiality Act. However, as is obvious, the trial court would not leave the determination of privilege to the Diocese and allow it to withhold whatever it deemed was protected. Rather, the trial court ordered the Diocese to submit all of the records to the court so that it could determine the issues of privilege and relevancy. Because the trial court has not yet held whether the records are discoverable, we cannot review the issue. See *Blaszczak v. City of Palos Hills*, 123 Ill. App. 3d 699, 703 (1984) (issues not ruled on by trial court are not properly before appellate court).

■ The Diocese argues that the trial court had no authority to order the records produced even for *in camera* inspection. We disagree. The Diocese relies on section 10(d) of the Confidentiality Act (740 ILCS 110/10(d) (West 2002)), which provides that no "records" or "communications," as defined by the Confidentiality Act, may be subjected to a subpoena without a written court order. Here, the trial court's discovery order served as the required written order.

The trial court must examine the discoverability of the documents in question with the recognition that the Confidentiality Act is a " 'strong statement' " by the legislature about the importance of keeping mental health records confidential. *Norskog*, 197 Ill. 2d at 71-72, quoting *Mandziara v. Canulli*, 299 Ill. App. 3d 593, 599 (1998). The courts must "zealously guard against erosion of the confidentiality privilege." *Norskog*, 197 Ill. 2d at 72. "Consequently, anyone seeking the nonconsensual release of mental health information faces a formidable challenge and must show that disclosure is authorized by the Act." *Norskog*, 197 Ill. 2d at 72.

■ Next, the Diocese advances several reasons why forced disclosure of the records of the intervention committee and misconduct officer would violate the religion clauses of the first amendment to the United States Constitution. The first amendment provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ***." U.S. Const.,

amend. I. The first amendment is applicable to the states through the due process clause of the fourteenth amendment. U.S. Const., amend. XIV; *People v. Jones*, 188 Ill. 2d 352, 356 (1999).

■ The Diocese's primary argument is that compelled disclosure of the documents would be "an intrusion by the State into the internal workings of the Catholic Church." The Diocese invokes the "church autonomy" doctrine, which is derived from both the free exercise clause and the establishment clause of the first amendment. *Newport Church of the Nazarene v. Hensley*, 335 Or. 1, 12, 56 P.3d 386, 392 (2002). The doctrine "bars any secular court from involving itself in the ecclesiastical controversies that may arise in a religious body or organization." *Abrams v. Watchtower Bible & Tract Society*, 306 Ill. App. 3d 1006, 1011 (1999). Accordingly, a court oversteps its bounds:

> "where a subject-matter of dispute, strictly and purely ecclesiastical in its character—a matter over which the civil courts exercise no jurisdiction—a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them—becomes the subject of its action." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733, 20 L. Ed. 666, 678 (1872).

The religious freedom guaranteed by the first amendment encompasses the "power [of religious bodies] to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 116, 97 L. Ed. 120, 136, 73 S. Ct. 143, 154 (1952).

The Diocese analogizes the case at hand to cases applying the church autonomy doctrine to enforce government separation from involvement in matters of church administration. See, *e.g., Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 49 L. Ed. 2d 151, 96 S. Ct. 2372 (1976) (declining to address defrocked bishop's claim that his removal from office was unlawful under the church's constitution and penal code); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 21 L. Ed. 2d 658, 89 S. Ct. 601 (1969) (refusing to adjudicate local church's claim that the central church had violated its constitution and departed from accepted doctrine and practice, thereby relinquishing its authority over property of local church); *Kedroff*, 344 U.S. 94, 97 L. Ed. 120, 73 S. Ct. 143 (striking down statute purporting to transfer control of the Russian Orthodox Church from the central governing hierarchy located in the Soviet Union to a church organization limited to the diocese of North America); *Watson*, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (refusing to adjudicate property dispute between factions within a

local church where each claimed superior rights because it was doctrinally the "true" church); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) (refusing to apply federal nondiscrimination law to the employment relationship between a religious organization and the minister it employed).

■ We fail to see the relevance of these cases. The Diocese reiterates throughout its briefs that the State's subpoena is an intrusion into the Diocese's religious activity that runs afoul of the bar against government "review [of] decisions that were reached upon ecclesiastical considerations" and "involve[ment] in the inner workings of churches." However, the Diocese cites not one aspect of its administration that the State threatens to commandeer. The State seeks records from the Diocese, defendant's employer, for the purpose of gathering evidence in a criminal prosecution against defendant under the laws of Illinois. The State has neither expressed nor implied an aim to determine for itself whether defendant violated canon law, much less to override any determination of the Diocese on that point. See *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1397 (9th Cir. 1994) (holding that first amendment was not violated by city's investigation into whether the religious views of assistant police chief compromised his job duties, because the investigation "clearly had a valid secular purpose—to determine whether there was any basis to the allegations that Vernon's religious views were affecting his job performance in such a way as to violate either LAPD policies and regulations or the civil and constitutional rights of both police officers and citizens"); *United States v. Freedom Church*, 613 F.2d 316, 320 (1st Cir. 1979) (Internal Revenue Service (IRS) subpoena for church financial records had no potential to violate the first amendment: "[T]he IRS does not seek to regulate or in any way become involved in the religious activities or control the financial matters of the church. It merely seeks to make a determination, based on all available and pertinent data, of the church's tax exempt status"); *In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078, 1081 (E.D.N.Y. 1978) (rejecting seminary's first amendment challenge to subpoena for financial records: "The Seminary makes no claim that the subpoena was issued as part of an attack on its students', faculty members', or administrators' Jewish beliefs. Nor does it appear that production of the demanded records would violate any tenet of Judaism. The grand jury has not required compliance with the subpoena in a manner at odds with Jewish law or belief by, for instance, requiring Seminary officials to appear on a holiday").

The Diocese relies on *Surinach v. Pesquera de Busquets*, 604 F.2d 73 (1st Cir. 1979). In *Surinach*, Puerto Rico's Department of Consumer

Affairs (Department), which was responsible for implementing price controls, issued a subpoena for documents from schools operated by the Catholic Church. The government specifically requested documents concerning the operating costs of the schools. The Church refused to comply with the subpoena and sued the Department, claiming that the Church's religious autonomy was threatened. The appellate court agreed, holding that the subpoena constituted "a palpable threat of state interference with the internal policies and beliefs of *** church related schools." *Surinach*, 604 F.2d at 76-77. The court found that the government's investigation could result in a subversion of the Church's express aim of providing superior education both in religious doctrine and secular subjects:

> "We think it clear that the eventual use to which the school's cost information could be put could interfere seriously with these religious duties and objectives. The Department, sifting through the details of the schools' budgets and holding its hearings, may conclude that costs are rising too fast and must be contained to a specified level. While such a determination might be consistent with the Department's mandate, it surely could clash with what is a religious belief and practice of those who administer these schools, namely that the highest quality education possible must be provided to their students. We do not suggest that quality of education and the expenditure of money invariably are linked, but it would be unrealistic to assume that the curricula and facilities of these schools would not be curtailed and hence religious objectives affected if they were forced to contain their costs." *Surinach*, 604 F.2d at 77.

The subpoena in this case does not threaten the kind of state involvement with religion that the court in *Surinach* foresaw. There is no potential for state subversion of religious objectives. The State seeks Diocesan records to determine whether defendant violated secular law. The State evinces no desire to co-opt any judgment of the Diocese regarding defendant's compliance with canon law, or even to examine canon law. There simply is no substance to the Diocese's assertion that the subpoena is an insidious attempt to "force upon the Diocese the government's view about how it should discipline priests accused of misconduct."

We understand that the Diocese cannot comply with the subpoena without violating Canon 489. However, the Diocese points to nothing in the record suggesting that Canon 489 is rooted in a religious value. The Diocese has not satisfied us that a violation of Canon 489 for the sake of a criminal investigation is anything like the imposition of price controls in *Surinach* that had the potential of undermining the quality of doctrinal instruction in Catholic schools. *Surinach* itself

recognized that its analysis would have been different had the subpoena been issued in a criminal investigation: "This is not a case in which records of a religious organization are subpoenaed pursuant to a criminal investigation, a situation in which the state's interest unquestionably is strong." *Surinach*, 604 F.2d at 80.

We reject the Diocese's attempt to conjure a right to secrecy, and with it immunity from the State's subpoena power, simply by pointing to the veil it has cast over itself. "Merely because Canon 489 is controlling in the internal operation of the affairs of the Church does not mean that it permits evidence pertaining to sexual molestation of children by priests to be secreted and shielded from discovery which is otherwise proper." *Hutchison*, 414 Pa. Super. at 145, 606 A.2d at 908. Notably, the Diocese's use of Canon 489 as a shield against disclosure of records pertaining to criminal allegations against Church clergy is difficult to reconcile with the lofty civic spirit of the Charter, in which the Church promises to "comply with all applicable civil laws with respect to the reporting of allegations of sexual abuse of minors to civil authorities and *** cooperate in their investigation in accord with the law of the jurisdiction in question."

The Diocese also claims a first amendment interest in not exposing to the public the "religious thoughts and ideas of members of the Church" that supposedly are contained in the intervention committee and misconduct officer records. Like the State, we cannot quite envision what theology could add to the investigation of alleged acts whose heinousness is obvious to the naked moral sense. In any event, the Diocese cites no authority for the proposition that a religious organization may resist a criminal subpoena simply for fear of exposing its religious beliefs.

The Diocese also argues that the subpoena is improper because the Diocese has not been charged with a crime. The Diocese cites no authority recognizing a first amendment right of an entity to defy a prosecutor's subpoena simply because the entity has not been charged with a crime. Certainly, the law of Illinois recognizes no such right. See *People v. Nohren*, 283 Ill. App. 3d 753, 759-60 (1996) (State may exercise its subpoena power in the course of criminal investigation, before charges are filed). Here, the State seeks to enforce a neutral, generally applicable criminal law to which there can be no first amendment objection. See *Minersville School District v. Gobitis*, 310 U.S. 586, 594-95, 84 L. Ed. 1375, 1379, 60 S. Ct. 1010, 1013 (1940) ("Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs"); *Cantwell v. Connecticut*, 310 U.S. 296, 306, 84 L. Ed. 1213,

1219, 60 S. Ct. 900, 904 (1940) ("Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury"); *United States v. Moon*, 718 F.2d 1210, 1227 (2d Cir. 1983) ("The First Amendment does not insulate a church or its members from judicial inquiry when a charge is made that their activities violate a penal statute").

■ Next, the Diocese argues that the State "has utterly failed to show that it cannot obtain the information it seeks through sources other than the Diocese." The Diocese does not cite any state law requiring that the State make such a showing. Instead, the Diocese supports its argument by citing to *Surinach*, which applied not only the church autonomy doctrine but general free exercise principles set forth in *Sherbert v. Verner*, 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963), and subsequent cases. According to these cases, the government "may justify an inroad on religious liberty [only] by showing that it is the least restrictive means of achieving some compelling state interest." *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 718, 67 L. Ed. 2d 624, 634, 101 S. Ct. 1425, 1432 (1981). The Diocese's point is that the State has not shown it is pursuing the least restrictive means of pursuing its investigation. We disagree that the State must make that showing. In *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872, 878-79, 108 L. Ed. 2d 876, 885-86, 110 S. Ct. 1595, 1600 (1990), the Supreme Court limited the applicability of the *Sherbert/Thomas* test, holding that a law is valid under the free exercise clause, despite its effect on religion, if it is neutral and generally applicable. A law is not "neutral" if the object of the law is to infringe upon or restrict practices because of their religious motivation. *Smith*, 494 U.S. at 878-79, 108 L. Ed. 2d at 885-86, 110 S. Ct. at 1599-1600. Both the substantive and procedural laws under which the State is prosecuting defendant and seeking discovery are unquestionably neutral and generally applicable. Therefore, we see no constitutional requirement that the State show the impossibility of obtaining the information it seeks from sources other than the Diocese.

■ Finally, in answer to the Diocese's claims that its practice of religion is jeopardized by the subpoena, we echo the remarks of the Pennsylvania Superior Court in *Hutchison*:

"[W]here the only action required of a religious institution is the disclosure of relevant, non-privileged documents to an adversary in *** litigation, such action, without more, poses no threat of governmental interference with the free exercise of religion. In the instant case, there is not one iota of evidence that court ordered discovery will 'chill' the rights of appellants in the conduct of their

religious affairs or inhibit their parishioners from engaging freely in the practice of their religious beliefs and activities. As the trial court appropriately observed, '[t]he relevant inquiry is not whether the church gives a file a particular name, but whether disclosure of the information requested from that file interferes with the exercise of religious freedom." *Hutchison*, 414 Pa. Super. at 152, 606 A.2d at 912.

■ The Diocese's final constitutional argument against the trial court's discovery order is that the State's use of its subpoena power is unlawful as an "effort to circumvent the fourth amendment's prohibition against unreasonable searches and seizures." The Diocese cites no authority for this argument. "Mere contentions, without argument or citations of authority, do not merit consideration on appeal." *McCleary v. Board of Fire & Police Commissioners*, 251 Ill. App. 3d 988, 995 (1993); See 210 Ill. 2d R. 341(e)(7) (points not argued on appeal are waived).

■ Next, the Diocese argues that all records of the misconduct officer and intervention committee pertaining to defendant are categorically protected by the clergy member privilege. The Diocese argues that the trial court interpreted the clergy member privilege too narrowly. Section 8—803 of the Code of Civil Procedure (Code) (735 ILCS 5/8—803 (West 2002)) provides:

"Clergy. A clergyman or practitioner of any religious denomination accredited by the religious body to which he or she belongs, shall not be compelled to disclose in any court, or to any administrative board or agency, or to any public officer, a confession or admission made to him or her in his or her professional character *or* as a spiritual advisor in the course of the discipline enjoined by the rules or practices of such religious body or of the religion which he or she professes, *nor be compelled to divulge any information which has been obtained by him or her in such professional character or as such spiritual advisor.*" (Emphasis added.)

Relying on the emphasized language, the Diocese suggests that section 8—803 of the Code not only specifically protects "admissions" or "confessions" made to a clergy member in his capacity as "spiritual advisor in the course of the discipline enjoined by the rules or practices of [the] religious body or of the religion which [the clergy member] professes"; it also contains a catchall phrase protecting not only such "admissions" or "confessions" but also "any information" obtained by a clergy member in his "professional character." Accordingly, the Diocese argues that "it matters not whether those whom the Intervention Team or Misconduct Officer interviewed made confessions or admissions; so long as the Diocese's clergy and practitioners obtained

'any information' from witnesses or others in either their 'professional capacities' or as 'spiritual advisers,' the information is statutorily protected against compelled disclosure."

The primary purpose of statutory construction is to determine and give effect to the legislature's intent. *In re B.L.S.*, 202 Ill. 2d 510, 514-15 (2002). The primary indicator of the legislature's intent is the statutory language itself. *Carver v. Sheriff of La Salle County*, 203 Ill. 2d 497, 507 (2003). We do not read section 8—803 as broadly as the Diocese. In our view, the clergy member privilege extends only to information that an individual conveys in the course of making an admission or confession to a clergy member in his capacity as spiritual counselor. We reject the Diocese's suggestion that a clergy member's "professional character" is broader than his role as "spiritual advisor" under section 8—803. In *People v. Bole*, 223 Ill. App. 3d 247 (1991), the defendant argued that a conversation with his minister, during which he confessed to a crime and sought "spiritual help," was privileged under section 8—803. This court rejected the claim of privilege because the minister testified that he had told the defendant prior to the conversation that the defendant was ineligible for counseling because he had previously lied to the minister. This court concluded that the defendant's admissions "were not obtained by the minister in his professional character *or* as a spiritual advisor." (Emphasis added.) *Bole*, 223 Ill. App. 3d at 263.

Significantly, we did not conclude in *Bole* that the defendant's statements were not obtained by the minister in his professional character *as* spiritual advisor, and then proceed to determine whether the minister received the defendant's statements in some other professional character. Rather, we equated the minister's professional character with his capacity as "spiritual advisor."

A textual analysis of section 8—803 supports *Bole*'s reasoning. The first clause of section 8—803 accords protection to any "admission" or "confession" made to a clergy member "in his or her professional character or as a spiritual advisor in the course of the discipline enjoined by the rules or practices of [the] religious body or of the religion which [the clergy member] professes." Notwithstanding the disjunctive between "professional character" and "spiritual advisor," we believe the requirement that a "confession" or "admission" to the clergy member be made "in the course of the discipline" applies to all confessions and admissions received by the clergy member.

"Course of discipline" is the crucial phrase. No Illinois case or statute defines it. " 'In construing an Illinois statute, decisions of other States construing similar laws are entitled to respect and consideration.' " *Urban v. Loham*, 227 Ill. App. 3d 772, 776 (1992),

quoting *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 660 (1979). Several states have enacted a statutory clergy member privilege protecting confessions or admissions made to a clergy member "in the course of the discipline" imposed by the religion that the clergy member professes. See, *e.g.*, Ariz. Rev. Stat. Ann. § 12—2233 (West 2002); Idaho Code § 2—203 (1998); Ind. Code Ann. § 34—46—3—1 (West 2002); Mass. Gen. Laws Ann. ch. 223, § 20A (West 2002); Mich. Comp. Laws Ann. § 600.2156 (West 2002); Minn. Stat. Ann. § 595.02 (West 2002); Mont. Code Ann. § 26—1—804 (West 2002); Utah Code Ann. § 78—24—8 (2000); Wash. Rev. Code Ann. § 5.60.060 (West 2002). Case law in several of these states has defined what it means for an admission or confession to be made in the "course of the discipline" imposed by the religion that the clergy member professes. For instance, the Minnesota Supreme Court has said:

"[W]e take judicial notice of the fact, that such 'discipline' is traditionally enjoined upon all clergymen by the practice of their respective churches. Under such 'discipline' enjoined by such practice all faithful clergymen render such help to the spiritually sick and cheerfully offer consolation to suppliants who come in response to the call of conscience." *In re Swenson*, 183 Minn. 602, 605, 237 N.W. 589, 591 (1931).

The Washington court of appeals has said:

" '[D]iscipline enjoined' refers to the duties of the clergy member and to the rules of such clergy member's faith. The clergy member must be constrained by his or her religious dictates to receive penitential communications and to provide spiritual instruction and guidance in return." *State v. Martin*, 91 Wash. App. 621, 630, 959 P.2d 152, 157 (1998).

We agree with these authorities and hold that the "discipline" referred to in section 8—803 is limited to the set of dictates binding a clergy member to receive from an individual an "admission" or "confession" for the purpose of spiritually counseling or consoling the individual. Therefore, to fall under the protection of section 8—803, a communication must be an admission or confession (1) made for the purpose of receiving spiritual counsel or consolation (2) to a clergy member whose religion requires him to receive admissions or confessions for the purpose of providing spiritual counsel or consolation.

We recognize that the final clause of section 8—803 prohibits compelled disclosure of "any information which has been obtained by [the clergy member] in such professional character or as such spiritual advisor." 735 ILCS 5/8—803 (West 2002). The inclusion of "such" is a reincorporation of the preceding definition of "professional character" and "spiritual advisor," which as we have noted, is qualified by the

phrase "in the course of the discipline enjoined by the rules of practices of such religious body or of the religion which [the clergy member] professes." "Any information" communicated in the course of an admission or confession made for the purpose of receiving spiritual consolation or counseling is privileged. See *Snyder v. Poplett*, 98 Ill. App. 3d 359, 362 (1981) (information about decedent's will that she conveyed to her minister during his "pastoral calls" at her hospital was privileged under section 8—803).

We note, however, that the privilege extends only to admissions or confessions made in confidence. *People v. Diercks*, 88 Ill. App. 3d 1073, 1078 (1980). Thus, an admission or confession is not privileged if made to a clergy member in the presence of a third person unless such person is "indispensable" to the counseling or consoling activity of the clergy member. *Diercks*, 88 Ill. App. 3d at 1078. Therefore, the trial court erred in holding that the privilege extends only to admissions or confessions made in a one-on-one setting.

We also note that, as long as the communicant does not waive the privilege by communicating the admission or confession to nonprivileged parties, section 8—803 bars forced disclosure not only of the admission, confession, or accompanying "information" as originally articulated to the recipient, but also of any reiteration or repetition in any form. However, we add the following caveat. We agree with the Pennsylvania Superior Court in *Hutchison*, 414 Pa. Super. at 146, 606 A.2d at 909, that the clergy member privilege does not protect any information that a religious institution acquires independently of a communication that is privileged by section 8—803, even if that information is the same as that conveyed in the confidential communication.

In view of the foregoing, we hold that the Diocese must produce to the trial court all intervention committee and misconduct officer records relating to defendant, including any records sealed under Canon 489. The trial court will then determine *in camera* whether any of the records are protected by section 8—803 as construed above.

■ Next, the Diocese urges that we find the misconduct officer and intervention committee records protected by a "critical self-analysis" privilege. This privilege is applied widely in the federal courts (see, *e.g.*, *Morgan v. Union Pacific R.R. Co.*, 182 F.R.D. 261 (N.D. Ill. 1998), but, as the Diocese concedes, has never been recognized in Illinois common law. The closest statutory analogue is section 8—2101 of the Medical Studies Act (Act) (735 ILCS 5/8—2101 (West 2002)), which protects against discovery of hospital documents related to internal quality control. "The purpose of the Act is to ensure that the members of the medical profession will effectively engage in

self-evaluation of their peers in the interest of advancing the quality of health care." *Green v. Lake Forest Hospital*, 335 Ill. App. 3d 134, 137 (2002). The Diocese reasons, analogously, that its goal of keeping clergy in compliance with canon law will be thwarted if individuals cannot expect that their reports of clergy misconduct will be kept confidential.

Whatever the force of this reasoning, it does not warrant an exercise in "judicial legislation" (*Thurman v. Grinnell Mutual Reinsurance Co.*, 327 Ill. App. 3d 920, 929 (2002)). The privilege that the Diocese would have us recognize implicates competing public policy considerations that are best weighed by the General Assembly. See *People ex rel. Birkett v. City of Chicago*, 184 Ill. 2d 521, 526, 532-33 (1998) (refusing to create a "deliberative process privilege" that would protect "certain classes of intra-agency communications offered in the course of governmental decisionmaking," because the complex policy factors underlying the privilege were best left to the legislature). We decline to consider whether the privilege should be made part of Illinois law.

The Diocese asks that we vacate the contempt order because the Diocese had requested the order in good faith, with the aim of testing the validity of the underlying discovery order. See *Sakosko v. Memorial Hospital*, 167 Ill. App. 3d 842, 848 (1988) (vacating contempt citation incurred by a good-faith decision to seek vindication of privilege claims on appeal). The State does not oppose the request. The record reflects that the Diocese showed no disdain for the trial court but, rather, specifically requested a contempt order for the purpose of pursuing an appeal of a nonfinal discovery order. In accordance with the parties' agreement, we vacate the contempt order.

To summarize, we (1) affirm the judgment of the circuit court ordering the Diocese to produce for *in camera* inspection records indicating the reasons for defendant's placement at St. Luke's; (2) affirm the judgment of the circuit court ordering the Diocese to produce misconduct officer and intervention committee records pertaining to defendant for the circuit court to determine *in camera* whether the records are protected by the clergy member privilege; and (3) vacate the contempt order against the Diocese.

For the reasons stated above, the judgment of the circuit court of Kane County is affirmed in part and vacated in part, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part and vacated in part; cause remanded with directions.

BOWMAN and GILLERAN JOHNSON, JJ., concur.