2015 IL App (2d) 140995
No. 2-14-0995
Opinion filed September 23, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 13-CF-385 |
| CHRISTOPHER THODOS, | ) ) | Honorable Robbin J. Stuckert, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices McLaren and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1                                    I. INTRODUCTION

¶ 2    Defendant, Christopher Thodos, was charged with violating an order of protection when he allegedly went to the home of his ex-wife and slashed the tires on a car sitting in the home's driveway (720 ILCS 5/12-3.4(a) (West 2012)). At defendant's bench trial, Robert Sutter invoked the clergy-penitent privilege (735 ILCS 5/8-803 (West 2012)), claiming that, as defendant's "spiritual advisor," he could not be forced to testify about an incriminating admission defendant made to him. Defendant joined in invoking that privilege. The trial court found that the privilege applied, and the State filed a certificate of impairment and timely appeals. See Ill. S. Ct. R. 604(a)(1) (eff. Feb. 6, 2013). For the reasons that follow, we affirm.

¶ 3                                II. BACKGROUND

¶ 4     The facts relevant to the issues raised are as follows.   During the State's case-in-chief, Sutter was called to testify.   Before he was asked any substantive questions, Sutter inquired of the court whether, because he was defendant's "spiritual adviser," he would have to testify.   After the parties presented their positions on that issue, the court allowed the parties to present evidence on whether the clergy-penitent privilege applied.   In that regard, Sutter testified that he was neither a pastor at the First Baptist Church of Sycamore, which is where he met defendant, nor a paid member of any clergy.[1]   However, in response to questioning about whether he had any formal training in spiritual counseling, Sutter indicated that he had spoken with his pastors and been discipled by numerous religious people throughout his Christian life.

¶ 5     Concerning his relationship with defendant, Sutter, who was a leader of a small Bible-study group at the church, stated that, in 2013, when defendant allegedly violated the order of protection, he was discipling defendant.   Although Sutter and defendant could be considered " 'accountability partner[s],' " Sutter stated that he was "not so much just an accountability partner [as he] was *** a discipler to [defendant]."   At first, Sutter began discipling defendant at defendant's wife's urging,[2] and he paid for defendant to attend a spiritual training seminar and a Christian-based rehabilitation and recovery camp.   Defendant asked Sutter to " 'please look out for [him]' " and " 'keep [him] accountable,' " as " '[defendant] need[ed] Sutter].' "   As the relationship continued, defendant confessed a number of things to Sutter, while Sutter

---

[1] Sutter testified that, although he attended the First Baptist Church of Sycamore in 2013, he now attended Bethel Assembly of God.

[2] The record does not disclose whether defendant's "wife" was a current wife or his ex-wife.

remembered confessing only one thing to defendant. After making his confessions, which were intended to be confidential, defendant would pray with Sutter and ask for forgiveness and strength, and Sutter would then, as part of this process, rebuke defendant. Sutter indicated that, as a small-group leader, he had the same type of relationship with other people, but he stated that he was not as invested in these other relationships. When defendant made the pertinent admission to Sutter, defendant was at the Christian-based rehabilitation and recovery camp and Sutter was at home.

¶ 6    Sutter testified that he often would talk to and pray with the pastor, assistant pastor, and other members of the small group about the matters that defendant and Sutter discussed. One of the small-group members to whom Sutter spoke was police officer Daniel Hoffman. When Sutter spoke to Hoffman about defendant's admission pertinent here, which Sutter testified he shared with Hoffman at Sutter's son's baseball game, Hoffman did not "indicate that he was speaking to [Sutter] in [Hoffman's] professional capacity." That is, "[Hoffman] wasn't talking to [Sutter] about criminal charges," and Hoffman never indicated to Sutter that Sutter could be called to testify against defendant. Indeed, "[Sutter] was flabbergasted when [he] found out that that was going to be the outcome." Although Hoffman, who testified that he spoke to Sutter on the phone about defendant's admission, stated that he did not specifically tell Sutter that he was talking to him as a police officer, he did "advis[e] [Sutter] obviously [that he] was involved in the case and that because of [their] conversation that it was going to go on record and [he] advised [Sutter] that he probably would be called to testify in court if need be." In response, according to Hoffman, Sutter merely indicated that "he just wishe[d] that [defendant] would just plead guilty and accept what he had done."

¶ 7     Sutter testified that he talked to about eight people about the pertinent admission.   These people included Sutter's wife, defendant's counselor at the rehabilitation and recovery camp, a man who attended the spiritual training seminar with defendant, the pastor, the assistant pastor, and other members of the small group.   As was defendant's intent when he made the admission to Sutter, Sutter's intent in sharing it was that it would remain confidential and result in defendant's betterment, as Sutter would gain advice on how to proceed in discipling defendant.

¶ 8     When asked more about his position with the church, Sutter testified that he was "designated by the authority in the church" to be a small-group leader.   That is, regardless of whether Sutter or the church initiated interest in his becoming a leader, he was "accepted" by the "[church] elders."   The church elders are the "people that are responsible for the spiritual decisions of the church."   They are "the governing body, even over the pastor," and, as such, they determine things like "how much money [the church] spend[s and] who [are the] leaders in the church."   Sutter, who had been in "eldership training," explained that he and his wife started a small group and that they sought members at a pig roast the church hosted.   At the pig roast, church members could sign up for whatever group session of Sutter's they wanted to attend. Sutter estimated that the church had eight small groups with seven to eight people in each group, and he said that the groups would meet at the church or at members' homes.   Sutter also stated that he believed that there were written rules governing small-group leaders and accountability partners.   Sutter testified that, in addition to leading the small group, he was "authorized" by the elders to baptize defendant.

¶ 9     The court found that, because the clergy-penitent privilege applied, Sutter did not have to testify about the pertinent admission.   In reaching that conclusion, the court found that Sutter was approved by the church elders, who comprised the governing body responsible for making

spiritual decisions, to lead a small group and baptize defendant. Defendant and Sutter entered into a relationship "[that] was referred to as a disciple to the defendant, and the relationship was supervised by the pastor." Moreover, "conversations between [Sutter] and the defendant were intended to be of a confidential nature" and "were discussed with the pastor, counselors [at the rehabilitation and recovery camp,] and other church members for the purposes of prayer."

¶ 10     Turning to consider the clergy-penitent statute in light of these facts, the court noted that many of the terms in the statute are not defined. Thus, the court considered the common meaning of various words. For example, the court found that Sutter was a "practitioner" "accredited" by the First Baptist Church of Sycamore, as the church elders authorized him to do various things. See 735 ILCS 5/8-803 (West 2012). Moreover, the court determined that the mere fact that Sutter talked to others about what defendant told him did not waive the privilege, as the evidence indicated that such admissions were shared with the understanding that they would remain confidential. See *id.*

¶ 11                          III. ANALYSIS

¶ 12     At issue in this appeal is whether the clergy-penitent privilege applies so that Sutter may not be made to testify about the pertinent admission defendant made to him. In addressing that issue, we must first examine the applicable statute. The clergy-penitent statute provides:

> "A clergyman or practitioner of any religious denomination accredited by the religious
> body to which he or she belongs, shall not be compelled to disclose in any court, or to
> any administrative board or agency, or to any public officer, a confession or admission
> made to him or her in his or her professional character or as a spiritual advisor in the
> course of the discipline enjoined by the rules or practices of such religious body or of the
> religion which he or she professes, nor be compelled to divulge any information which

has been obtained by him or her in such professional character or as such spiritual advisor." *Id.*

¶ 13    Essentially, the statute provides that a "clergyman" or "accredited" "practitioner" cannot be compelled to testify about admissions or confessions made to him or her for the purpose of seeking spiritual guidance. See *People v. McNeal*, 175 Ill. 2d 335, 359 (1997) (statements the defendant made to his brother, the defendant's spiritual advisor, were not covered by the clergy-penitent privilege, as the statements were not relayed to the brother in the brother's position as a spiritual advisor). Here, the State does not dispute that defendant relayed the pertinent admission to Sutter for the purpose of obtaining spiritual guidance.[3] Rather, the State claims that (1) Sutter was not a "clergyman" or "practitioner" as defined in the statute and that, even if he was, (2) the privilege was waived once Sutter discussed the admission with other people.

¶ 14    Both of the issues raised require us to construe the clergy-penitent statute. In construing a statute, we must keep in mind the well-settled rules of statutory construction. The primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 93. The surest and most reliable indicator of this intent is the language of the statute itself. *Id.* When the language is clear and unambiguous, we must apply the statute without resorting to any extrinsic aids of construction. *Id.* Moreover, we must construe the statute to avoid rendering any part of it meaningless or superfluous, and we cannot view words and phrases in isolation. *People v. Martino*, 2012 IL App (2d) 101244, ¶ 26. Rather, we must consider the words and phrases in light of other relevant provisions. *Id.*

---

[3] In its brief, the State does not argue this point, and, although the State claimed at oral argument that it was disputing this point, it did not clearly indicate why.

We also may consider the consequences that would result from construing the statute one way or the other, and, in doing so, we must presume that the legislature did not intend absurd, inconvenient, or unjust results. *Id.*

¶ 15    Although we review *de novo* the construction of a statute (see *id.*), we review the court's findings of fact under the manifest-weight-of-the-evidence standard (see *McNeal*, 175 Ill. 2d at 359; see also *People v. Diercks*, 88 Ill. App. 3d 1073, 1078 (1980)).    Findings of fact are against the manifest weight of the evidence if the opposite conclusion is readily apparent or if the findings are unreasonable, arbitrary, or not based on the evidence.    *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 102.

¶ 16    Here, the trial court found that the church elders authorized Sutter to lead a small group and to baptize defendant; that Sutter discipled defendant under the supervision of the pastor; that Sutter had confidential conversations with other people about the admission defendant made to him; and that Sutter shared defendant's admission with others only for the purpose of gaining spiritual advice.    We determine that these findings are not against the manifest weight of the evidence.

¶ 17    Turning to the specific statutory-construction issues raised, we first consider whether Sutter was a "practitioner of any religious denomination accredited by the religious body to which he or she belongs."    735 ILCS 5/8-803 (West 2012).    Although "[t]he obvious effect of such a [term] is to be as inclusive as possible, only requiring that the [person] is indeed a bona fide religious counselor" (Ronald J. Colombo, *Forgive Us Our Sins: The Inadequacies of the Clergy-Penitent Privilege*, 73 N.Y.U. L. Rev. 225, 232 (1998)), neither "practitioner" nor "accredited" is specifically defined in the clergy-penitent statute, and neither the parties nor this court has found Illinois authority addressing those terms as used in the statute.    Accordingly, we, like the trial court, will look to the dictionary to give the terms their ordinary and popularly

understood meanings.   See *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000) ("[A] court may look to dictionary definitions to derive the plain and ordinary meaning without rendering the term ambiguous.").

¶ 18    "Practitioner" is defined as "one that does something or follows some course or regimen habitually or customarily."   Webster's Third New International Dictionary 1780 (1993). "Accredit" is defined as "to give official authorization to or approval of," "to order or permit to proceed on an official mission or on one otherwise officially recognized," or "to vouch for officially."   *Id.* at 13.   In light of these definitions, we conclude that Sutter was a "practitioner of [a] religious denomination accredited by the religious body to which he *** belong[ed]." 735 ILCS 5/8-803 (West 2012).

¶ 19    Specifically, the evidence established that the church elders did authorize Sutter to lead a small group and to baptize defendant.   Thus, the elders, acting on behalf of the church, certainly did "accredit" Sutter to perform certain activities.   Although nothing in the statute specifically requires that the practitioner be authorized to receive confessions or admissions from others, the facts here strongly suggest that the church was well aware of the fact that Sutter, as defendant's spiritual advisor, was doing just that.   Indeed, Sutter regularly spoke with the pastor and assistant pastor about the things to which defendant confessed.   Moreover, the evidence established that Sutter was fully and regularly engaged in his religious edification with the church.   He not only led a religious life, having been discipled himself throughout his Christian life, but he led a small group for the church, was charged with discipling others, and was in training to become a church elder.

¶ 20    In reaching this conclusion, we find support in *In re Verplank*, 329 F. Supp. 433 (C.D. Cal. 1971), which defendant cites.   There, the court extended the clergy-penitent privilege to

counselors assisting an ordained Protestant minister in talking to service registrants about, allegedly, how to evade being drafted to serve in the Vietnam War. *Id.* at 434-36. The court found that the privilege should be extended to cover the counselors, many of whom were not ordained ministers, because, under the applicable state law and advisory notes, their acts, in a general way at least, conformed "with a significant portion of the activities of a minister of an established Protestant denomination." *Id.* at 436. In reaching that result, the court observed that, although the minister originally set out to counsel all the service people personally, that soon became impractical, given the growing number of people seeking his advice. *Id.* Moreover, the court observed that nothing in the law required that the person giving advice be ordained. *Id.*

¶ 21    Although *Verplank* differs from this case in some ways, we find the reasoning employed in *Verplank* applicable here. Specifically, as in *Verplank*, nothing in Illinois's clergy-penitent statute requires that the person giving spiritual advice be ordained or otherwise formally recognized after completing specific religious training. Indeed, while the use of the term "clergyman" might require as much,[4] a "practitioner" needs merely to be authorized by the religious organization to which he or she belongs. 735 ILCS 5/8-803 (West 2012). Further, as in *Verplank*, it is unfeasible to expect a pastor of a church to counsel all of the people in the church. Although the specific number of people attending the First Baptist Church of Sycamore is unknown, Sutter testified that there were approximately 56 to 64 people in the small groups alone. When we consider the huge congregations of some other churches, like Willow

---

[4] See Webster's Third New International Dictionary 421 (1993) (defining "clergyman" as "a member of the clergy," "an ordained minister," or a "man regularly authorized to preach the gospel and administer its ordinances").

Creek Community Church, the ability of a clergyman to be available to counsel all of the people in the congregation becomes even less likely.[5] Thus, it makes sense that the church would authorize other people in the church to counsel fellow churchgoers in a manner similar to that of a clergyman. Moreover, as in *Verplank*, the evidence here strongly suggests that, when Sutter spoke with defendant, he, like the counselors in *Verplank*, did so as an assistant to the pastor of the church. That is, when defendant talked to Sutter, defendant, as he would with a pastor, admitted to things that he had done and sought forgiveness. Sutter and defendant would then pray together and ask for forgiveness, and, afterward, as part of the process, Sutter would rebuke defendant.

¶ 22    As an aside, we note that, in finding *Verplank* persuasive here, we certainly do not mean to define for the First Baptist Church of Sycamore, or any other church for that matter, the various roles that people fulfill in the religious organization. Rather, we are concerned only with whether the evidence regarding Sutter's position with the First Baptist Church of Sycamore demonstrated that he was qualified as a "practitioner" who was "accredited" by the church such that the privilege would apply.

¶ 23    Relying on *People v. Campobello*, 348 Ill. App. 3d 619 (2004), the State argues that the privilege does not extend to Sutter. In *Campobello*, the defendant, a priest, was charged with sexually assaulting a young girl. *Id.* at 622-23. The State subpoenaed the Catholic Diocese of Rockford to produce all records related to an internal investigation of the defendant. *Id.* at 623.

---

[5] See Gregory Array, *10 Biggest Churches in United States*, Turn Back to God (June 9, 2010, 1:51 a.m.), http://www.turnbacktogod.com/10-biggest-churches-in-united-states (listing the sole pastor at the church and noting that, at the South Barrington location alone, the total number of people in attendance is 23,400).

The Diocese claimed that such materials were protected under, among other things, the clergy-penitent privilege. *Id.* at 625. We determined that they were not, after defining terms such as "discipline," "information," "professional character," and "spiritual advisor" that are found in the latter part of the statute. *Id.* at 634-36. Nowhere in *Campobello* did we define "practitioner," as a definition for that term was immaterial in light of the facts.

¶ 24 Aside from the State's misplaced reliance on *Campobello*, we find the State's position to be in violation of the rules governing the construction of statutes. That is, under the State's view, the privilege should apply *only* when the person to whom an admission or confession is made is a member of the clergy. The clear and unambiguous language of the clergy-penitent statute indicates that it applies to admissions and confessions made to clergymen *and* "practitioner[s] of any religious denomination accredited by the religious body to which [they] belong[]." 735 ILCS 5/8-803 (West 2012). If we adopted the State's position, we would be reading out of the statute the "practitioner" language. This would make that language superfluous, which we must avoid. See *Martino*, 2012 IL App (2d) 101244, ¶ 26.

¶ 25 Second, we address whether the privilege was waived once Sutter discussed defendant's admission with other people. "A plain reading of the [clergy-penitent] statute[] reveals a design to protect those communications between clergymen and laymen that originate in confidence that they will not be disclosed." *Snyder v. Poplett*, 98 Ill. App. 3d 359, 362 (1981). At least two courts have recognized that the privilege is not destroyed simply because a third person is present when a defendant confesses to a clergyman or practitioner. See *Campobello*, 348 Ill. App. 3d at 636 ("[T]he trial court erred in holding that the privilege extends only to admissions or confessions made in a one-on-one setting."); *Diercks*, 88 Ill. App. 3d at 1078; see also Robert W. Webb, *Priest-Panitent* [*sic*] *Privilege*, 46 Chi.-Kent L. Rev. 48, 52 (1969) ("The presence of

third parties does not necessarily destroy the [clergy-penitent] privilege if the information is given in confidence."). Rather, if the third person is regularly engaged in aiding the clergyman or practitioner in giving spiritual advice, the privilege will survive. See *Diercks*, 88 Ill. App. 3d at 1078.

¶ 26    Here, the undisputed evidence revealed that, although Sutter relayed what defendant told him to eight other people, he did so only so that he could obtain advice on how to disciple defendant. We note that courts have found that "a showing of *indispensability* [of the third person] is necessary before a privilege is extended to nonprofessional representatives." (Emphasis added.) *Id.*; see also *Campobello*, 348 Ill. App. 3d at 636. However, we also note some disagreement on that point. See Robert W. Webb, *Priest-Panitent* [*sic*] *Privilege*, 46 Chi.-Kent L. Rev. at 52 (noting that the presence of third parties when a confession is given to a clergyman for the purpose of spiritual advice should not waive the privilege because, among other things, the statute requires simply that the confession be given for the purpose of obtaining spiritual advice, and the presence of third parties should not affect the clergyman's capacity to do so).

¶ 27    In any event, even if we were to conclude that Sutter waived the privilege when he relayed defendant's admission to other people, defendant did not do likewise. Because "[t]he privilege belongs both to the person making the statement and to the clergyman [or practitioner]" (*Thomas*, 2014 IL App (2d) 121001, ¶ 94), the privilege would still apply here, as nothing indicates that defendant, who joined Sutter in invoking the privilege, ever shared his admission with anyone other than Sutter.

¶ 28    Relying on *Cox v. Miller*, 296 F.3d 89 (2d Cir. 2002), the State claims that, because defendant's admission was shared with others, the admission was not confidential, and, thus, the

privilege does not apply. We disagree. At issue in *Cox* was whether statements the defendant made to members of his Alcoholics Anonymous group were privileged. *Id.* at 92. The court concluded that they were not. *Id.* at 110. The court found that, even if Alcoholics Anonymous could be considered a religion for purposes of the clergy-penitent statute, the evidence established that the defendant confessed to members of Alcoholics Anonymous about a murder "to unburden himself, to seek empathy and emotional support, and perhaps in some instances to seek practical guidance," not for the purpose of attaining spiritual advice. *Id.* at 111.

¶ 29　Here, in contrast, the evidence revealed that Sutter discipled defendant, with defendant making numerous admissions to Sutter. Defendant specifically asked Sutter to " 'please look out for [him]' " and " 'keep [him] accountable,' " as " '[defendant] need[ed] Sutter].' " Once defendant made admissions to Sutter, Sutter and defendant would pray and ask for forgiveness, and, as part of the process, Sutter would rebuke defendant. Most importantly, in order to better guide defendant spiritually, Sutter spoke to other people affiliated with the church, including the pastor and the assistant pastor, about the admissions defendant made. When Sutter shared defendant's admissions with other people in the church, the understanding was that the admissions would remain confidential. Nothing in the record indicates that defendant or Sutter, like the defendant in *Cox*, spoke with other people for any purpose but to help defendant spiritually.

¶ 30　　　　　　　　　　　　IV. CONCLUSION

¶ 31　In conclusion, we determine that the privilege applies, as Sutter was a "practitioner" as defined in the statute, and, even if Sutter waived the privilege, the privilege survived because defendant did not waive it. Because we conclude that the privilege applies, we will not address

defendant's argument under the first amendment to the United States Constitution (U.S. Const., amend. I).

¶ 32    For these reasons, the judgment of the circuit court of De Kalb County is affirmed.

¶ 33    Affirmed.