**Cynthia Diane DEEL, Plaintiff,**

v.

**BANK OF AMERICA, N.A., Defendant.**

No. CIV.A.7:04CV00150.

United States District Court,
W.D. Virginia,
Roanoke Division.

March 31, 2005.

Devon James Munro, John Palmer Fishwick, Jr., Lichtenstein, Fishwick & Johnson, PLC, Roanoke, VA, for Plaintiff.

Bruce M. Steen, McGuire Woods LLP, Charlotte, NC, for Defendant.

## MEMORANDUM OPINION

TURK, Senior District Judge.

This matter is before the Court on a Motion to Compel Discovery (Dkt. No. 61) by the plaintiff, Cynthia Diane Deel, who seeks to compel the production of documents held by the defendant, Bank of America ("BOA" or "the Bank"). BOA seeks to protect the documents described on its privilege log (Second Motion to Compel, Ex. C)[1] from disclosure on the grounds of the attorney-client privilege, the self critical analysis privilege, or both. The parties have submitted briefs, the court heard arguments on March 2, 2005, and the defendant has tendered the documents to the Court *in camera.* Upon review of the documents, the Court finds the self-critical analysis privilege does not apply to any tendered document; that the attorney-client privilege does not apply to a portion of the documents, while it does apply to another portion of the documents.

### I

### A

The attorney-client privilege is the oldest privilege for confidential communications known to the common law. *Upjohn Co. v. U.S.,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Where the attorney-client privilege applies, "it affords confidential communications between lawyer and client complete protection from disclosure."[2]

---

1. The privilege log has been sealed pursuant to an agreed protective order (Dkt. No. 17).

2. Because this case is civil and based on a federal cause of action, the Court will apply the principles of common law as they may be interpreted

*Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir.1998). It applies to individuals and corporations, and to in-house and outside counsel. *See Upjohn*, at 394, 101 S.Ct. 677. Because the attorney-client privilege "impedes the full and free discovery of the truth, it must be narrowly construed and recognized only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *In re Grand Jury Subpoena*, 341 F.3d 331, 335 (4th Cir.2003)(internal quotation marks and citations omitted).

The Fourth Circuit applies the "classic test" of the attorney-client privilege:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of a bar or court, or his subordinate and (b) in connection with this communication is acting in his capacity as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purposes of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed (b) and not waived by the client.

*In re Grand Jury Subpoena*, 341 F.3d at 336.

■■■ "The burden is on the proponent of the attorney-client privilege to demonstrate its applicability. The proponent must estab-

lish not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." *Id.* Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the privilege.[3] *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982).

**B**

The defendant also asserts the self critical analysis privilege as a basis for preventing disclosure of documents to the plaintiff.[4] This privilege, unlike the attorney-client privilege, has a much more recent geneses. *Etienne v. Mitre Corp.*, 146 F.R.D. 145, 147 (E.D.Va.1993) (citing *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970), *aff'd mem.*, 479 F.2d 920 (D.C.Cir.1973) as the origin of this purported privilege). The original purpose of the self-critical analysis privilege was to encourage candor when parties sought to improve their own procedures in providing care to patients. *Etienne*, 146 F.R.D., at 147. A number of other courts have relied upon a "self-evaluative" privilege in other factual settings. *See F.T.C. v. TRW. Inc.*, 628 F.2d 207, 210, (D.C.Cir.1980) (collecting cases). When expanded to other circumstances, however, courts generally use it to encourage activities that will protect human life or public health. *See, e.g., Bredice, supra; Reichhold Chemicals, Inc. v. Textron, Inc.*, 157 F.R.D. 522, 526 (N.D.Fla.1994).

by the courts of the United States in light of reason and experience. *Hawkins*, 148 F.3d at 382. The Fourth Circuit has approved Supreme Court Standard 503(b) as a "comprehensive guide to the federal common law of attorney-client privilege." *United States v. (Under Seal)*, 748 F.2d 871, 874 n. 5 (4th Cir.1984) (Supreme Court Standard 503(b) states in relevant part: "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself and his representative and his lawyer or his lawyer's representative, or (2) between the lawyer and the lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.")

3. Implied waiver, for example, occurs when the party claiming the privilege makes any disclosure of a confidential communication to any individual who is not embraced by the privilege. *In re Grand Jury Subpoena*, 341 F.3d at 336.

4. Although neither the Supreme Court nor the Fourth Circuit have expressly discredited this privilege, the Court also recognizes that the Supreme Court counsels strongly against the recognition of new privileges. *See Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). Further, the Court is not aware of any case in this Circuit both approving of this privilege and applying it to prevent disclosure of documents. The Court, therefore, wearily and skeptically treads into this territory.

■ Assuming *arguendo* that the privilege exists in this Circuit, it requires: (1) information contained in the document result from an internal investigation conducted to evaluate or improve a party's procedures or products; (2) the party originally had intended that the information remain confidential and demonstrate a strong interest in preserving the free flow of the type of information sought; and (3) the information contained in the document be of a type whose flow would be curtailed if discovery were allowed. *Etienne*, 146 F.R.D. at 147.

The defendant says that the information the plaintiff seeks resulted from an audit to improve its payroll practices that it intended to remain confidential. It also asserts that discovery of these documents would deter other employers from reviewing their compensation practices before they are subject to litigation.

The plaintiff counters, however, that the defendant has the burden when invoking (and, the plaintiff says, creating) a privilege. She argues that the defendant has failed to meet this burden because it has not asserted any supporting evidence. Further, here, discovery of such documents will serve the public interest and not deter businesses from complying with federal law in the future. *See Etienne*, 146 F.R.D. at 148–49. Finally, she asserts that the risk of liability, not corporate generosity, provoked BOA to conduct its investigation, and disclosure of these documents will not chill this motivation in the future.

■ Even if BOA could satisfy the first two requirements articulated in *Etienne*, the Court cannot conclude that the information contained in the documents are of a type whose flow would be curtailed if discovery were allowed. It emphasizes that its actions in conducting the audit of its job classifications were voluntary and intended to remain confidential. Jay J. Price, BOA's in-house counsel, however, belies this claim. "This audit was prompted in part by the national proliferation in Fair Labor Standards Act litigation against businesses in general *as well as the Bank in particular.*" Affidavit of

Jay J. Price, ¶ 4 (emphasis added). The litigation against the Bank that Jay Price refers to in his affidavit was an FLSA suit in California state court that some BOA employees brought in 2001. Thus, it strains credulity to ask the Court to believe that the audit process was voluntary when it admits that it was a reaction to pending litigation. The Court cannot conclude that the possible discovery of these documents would deter employers from reviewing their payroll practices to ensure compliance with federal law—particularly in the face of pending litigation.[5]

Assuming that the self-critical analysis privilege is a valid privilege at federal common law, the Court finds that the defendant has not developed sufficient facts to justify its application here. Further, application of this privilege here would contravene the public's interest in encouraging broad discovery and the court's making decisions based on all available information. *Etienne*, 146 F.R.D., at 148–49.

## II

The Court now turns to a discussion of the tendered documents. The Court has grouped the documents into categories based on the contents of each document, and will evaluate them *seriatim* in light of the attorney-client privilege.

## A

The first category of documents the court evaluated contain no facts communicated between BOA and its attorney. BOA0001; BOA0552; BOA0707; BOA0718; and BOA0911. The Court concludes that these documents are not subject to the attorney-client privilege because they fail the third prong of the classic test—that is, they were not created for the purposes of securing primarily legal advice. Thus, BOA cannot prevent the plaintiff from discovering them based on the attorney-client privilege.

---

5. The risk of future liability seems sufficient encouragement to overcome any possible deterrence. Additionally, the documents may remain undisclosed because of other privileges such as the attorney-client privilege. *See infra*, at 459–63.

## B

The next category of communications are documents BOA describes as "Email covering briefing materials regarding FLSA investigation arising from FLSA litigation prior to the creation of BCCR Operations Analyst position, defining team members, outlining tasks, etc., denoted as Attorney/Client Privileged Communication." BOA0765–75; BOA0787–810; and BOA0817–27. According to the final version of these draft documents, the "FLSA–T & O Reclassification Team Members" included: Genell Anderson. Renee Bowling, Paul C. Farmer, Cissy W. Hill, Charna Hollingsworth–Malone, Angela M. Mowen, Jay J. Price, and Viki Shiller. BOA0767. The Court will assume that these eight team members are the BOA employees Deborah S. Weiser, BOA's outside counsel, referred to in the letter of engagement she sent to Cissy Hill making the team her agents. BOA0001.

█ A corporation does not waive its privilege when non-lawyer employees send or receive communications because corporate communications which are shared with those having need to know of the communications are confidential for purposes of the attorney-client privilege. *Santrade, Ltd. v. General Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993). In addition to the team members and BOA's outside counsel, Bowling sent these documents to Mark Nichols, Mtg. Rtl. Lending, Account executive; Julie Stobbe, in-house legal assistant; Scott Boswell, SVP, Sr. Finance Manager–Business Finance Supp.; and Tracy Ryan, SVP, Compensation Manager. The Court will assume that the executives, Nichols, Boswell, and Ryan, needed to know of the communications, thus BOA did not waive its privilege by sending these documents to the executives. Further, Stobbe is clearly an agent of BOA's lawyers, therefore, sending it to her did not waive the privilege. The Court will assume, then, that all documents distributed or sent to any of the members of the team, the three executives, or outside or in-house counsel will not waive the attorney client privilege.

These documents seem to encompass BOA's desire to define how it planned to address the issue of reclassification of some job codes based on the impending FLSA litigation. As such, BOA clearly sent these documents to its in-house and outside counsel to facilitate legal services. Given this purpose, and the clear satisfaction of the other elements of the classic test, the attorney-client privilege applies to these documents.

## C

The next category of communications are documents BOA described as "FLSA investigation overview, covering purposes and goals of investigation." BOA0725–33. These documents seem to encompass BOA's desire to define how it planned to tackle the issue of reclassification of some job codes based on the impending FLSA litigation. The documents were sent by a team member to outside counsel clearly to facilitate the provision of legal services. Because BOA satisfies all of the other elements of the classic test, the attorney client privilege applies to these documents.

## D

The next category of communications are documents BOA described variously as "Email attaching protocol/procedure for FSLA investigation;" "Email attaching agenda for FSLA investigation team meeting;" and "Email regarding FLSA investigation team tasks and deadlines, including attached task list." BOA0751–61. These documents were distributed among the group of acceptable BOA employees and lawyers, and for legal services. Because BOA satisfies all of the other elements of the classic test, the attorney client privilege applies to these documents.

## E

The next category of communications concern the development of the questionnaire. BOA0555–73; BOA0669–72; BOA0679–81; BOA0710–15; BOA0719–24; BOA0735–48; BOA0776–86; BOA0811–16; BOA0829–910. Only those BOA employees the Court has already determined needed to know of communications involving this topic received or sent these documents, thus BOA has not waived its privilege. Further, BOA satisfies all other prongs of the classic test. Thus, the attorney client privilege applies to these documents.

## F

The next category of communications are documents BOA describes as "Email outlining communication to managers who will participate in study by completing FLSA questionnaires; draft communication is attached." BOA0675–78; BOA698–703. Essentially, these documents were drafts of the notice documents BOA intended to distribute to the employees who were to complete the questionnaire and communications regarding these documents. The documents were sent from BOA employees to outside counsel, and sought legal advice concerning the language of the notice. Because BOA meets all of the other elements of the classic test, the attorney client privilege applies to these documents.

## G

The next category of documents the court reviewed were the completed questionnaires. BOA0084–0543. The Supreme Court addressed the issue of the attorney-client privilege as applied to corporate questionnaires in *Upjohn, supra.* The Supreme Court explained, "[t]he communications at issue were made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel." *Upjohn*, 449 U.S. at 394, 101 S.Ct. 677. The privilege protected the questionnaire from discovery notwithstanding that members of the corporation's control group did not complete it. *Id.*, at 397, 101 S.Ct. 677.

The court based its conclusion on multiple facts. First, the information was not available from members of the control group, and was needed to supply a basis for legal advice concerning compliance with securities and tax laws and potential litigation. *Id.*, at 394, 101 S.Ct. 677. Second, the communications concerned matters within the scope of the employee's corporate duties. *Id.* Third, the employees completing the questionnaire were sufficiently aware that they were being questioned so that the corporation could obtain legal advice. *Id.* Fourth, "[a] statement of policy accompanying the questionnaire clearly indicated the legal implications of the investigation." *Id.* Finally, "the communications were considered highly confidential when made and have been kept confidential

by the company." *Id.*, at 395, 101 S.Ct. 677 (footnotes and citations omitted).

Here, BOA found itself in a similar position as Upjohn, but it did not respond in the same manner. Like Upjohn, BOA realized that it may have been in violation of federal law. It also realized that upper-echelon management did not possess the information it needed to obtain legal advice. It concluded, therefore, that it needed to question those employees who had the information it needed to obtain a legal opinion. It then sent a questionnaire to those employees who, as a function of their duties, possessed that information.

The defendant's fatal flaw, however, was that it did not clarify to the employees completing the questionnaire that it needed the information to obtain legal advice. In *Upjohn*, the company's Chairman explained in a letter accompanying the questionnaire that he asked the company's general counsel to conduct an investigation to determine the nature and magnitude of possible illegal activities. *Id.*, at 386–87, 101 S.Ct. 677. Here, the only possible way a BOA employee may have thought the information had a legal purpose was that the notice document referenced questions to "Advice & Counsel" department. The two references to the Advice & Counsel as the source for employee questions is not the same—or even similar—level of precaution Upjohn took in distributing its questionnaires.

The defendant also failed to explain in the notice section entitled "Background; Why Do We Need To Review Jobs?" that the purpose of the questionnaire was to help the Bank obtain legal advice. It stated:

Bank of America routinely reviews job titles, responsibilities and pay structure to ensure the most competitive compensation and appropriate banding and exemption status are in place in order to attract, reward and retain the best associates. A review process such as this sometimes results in positions being reclassified with respect to overtime eligibility.

The company depends on you to ensure that we understand the duties performed by your associates and that the associates are appropriately assigned to the jobs.

Our goal is to ensure we remain in compliance with the law outlined in the Fair Labor Standards Act as to how we pay our associates.

BOA1004. This section suggests the questionnaire was part of a routine review, not as an effort to obtain legal advice. Further, it says that it will use the information to remain competitive and reward its employees. These statements fail to indicate that the bank needed the information to obtain a legal opinion.

Although the Bank mentions relevant law, it does not overcome its burden to notify its employees that it needs their help in obtaining legal advice by this act alone. Simply reciting an act of Congress—especially when surrounded by language indicating non-legal purposes—does not create a clear statement of policy accompanying the questionnaire indicating the legal implications of the investigation. Indeed, using the word "remain" suggests it is in compliance with the law, and has no need for legal advice.

Additionally, it tells its employees that business leaders (not its general counsel or outside lawyers) would review the information gleaned from the questionnaires. *Id.* Such a statement suggests the information would facilitate the Bank in making a business decision not obtaining legal advice. *See Henson By and Through Mawyer v. Wyeth Laboratories, Inc.,* 118 F.R.D. 584, 587 (W.D.Va.1987) (holding that the attorney-client privilege does not apply where an attorney receiving a communication acts as a business advisor, or where the communication is to obtain business, rather than legal, advice). These references simply could not have put BOA employees on notice that the questionnaires would facilitate the company in obtaining legal advice.

Finally, Upjohn made certain that its employees knew the investigation was "highly confidential" and discouraged discussion of the matter with non-Upjohn employees. *Upjohn,* 449 U.S. at 387, 101 S.Ct. 677. Here, BOA's notice remains silent on the level of discretion it expected of its employees. Without more, the Court must conclude the Bank did not maintain the level of confidentiality the Supreme Court approved in *Upjohn.*

The reasonable conclusion from these notice statements is that BOA wanted to make a business decision informed by federal law—not obtain a legal opinion using information gathered from its employees. This failure to provide proper notice means that BOA cannot prevent the plaintiff from discovering the questionnaires based on the attorney-client privilege.

**H**

The next category of documents are excerpts from the questionnaire. BOA0002–0083; and BOA0544–49. These documents merely excerpt statements BOA employees made on the questionnaire. BOA cannot withhold these documents for the same reasons stated in the section concerning the completed questionnaires.

**I**

The next category of documents includes communications made generally between the acceptable group of BOA employees and lawyers concerning the evaluation of the questionnaire.[6] BOA0550–51; BOA0553; BOA0574–668; BOA0673–74; BOA0682–94; and BOA0734. The Court also includes in this category an outlook reminder of a meeting to discuss review of the questionnaire. BOA0554. BOA clearly meets all of the requirements of the classic attorney-client privilege test; therefore, the attorney-client privilege applies to these documents.

**J**

The next category of communications are meeting minutes concerning BOA's defense of *Wierman v. Bank of America, N.A.,* Orange County Superior Court Case No. 01CC07814, the California FLSA class action

---

6. Peggy Robertson, AVP, Process Design Manager; D'Ann D. Riemer, SVP, Senior Process Design Manager; Salome Vance, VP, Personnel Advison III; John R. Libbey, SVP, Sr. Personnel Services Exec.; Brian Pitts, AVP, Process Design Manager; Tiffany Peck, AVP, Training Delivery Manager II also received or sent various documents in this category. The Court will assume that these BOA employees also had need to know of the communications and will not deem BOA to have waived its privilege based on these recipients and senders.

suit. BOA 0704–06; and BOA 0762–64. Only those BOA employees the Court has already determined needed to know of communications involving this topic received these minutes or attended the meeting. Thus BOA has not waived its privilege. BOA also satisfies all other prongs of the classic test, therefore, the attorney client privilege applies to these documents.

### K

The next category of communications are documents related to BOA's defense in *Wierman*. BOA0708–09; BOA0716–17; BOA0749–50; and BOA0828. Again, only those BOA employees the Court has already determined needed to know of communications involving this topic received these documents, therefore, BOA has not waived its privilege. Further, BOA satisfies all other prongs of the classic test. Thus, the attorney client privilege applies to these documents.

### L

The next category of communications are minutes from a June 21, 2002 meeting to discuss the development of the questionnaire. BOA0695–97. Here, in addition to the already approved list of BOA employees, other BOA employees received these documents. The other recipients were; Todd McPeak, VP Compensation Consultant; Karen Pappas, SVP, Compensation Manager; Nichole Davis, AVP, Compensation Consultant I; Lucy Anderson, VP, Compensation II; Karen Y. Britt, Administrative Assistant III; Danielle Collins, AVP, Non–US Business Consultant; and Tiffany Graybeal, AVP, Compensation Consultant II. The Court will assume that these BOA employees also had a need to know of the communications and will not deem BOA to have waived its privilege based on these recipients. Further, BOA satisfies all other prongs of the classic test. Thus, the attorney client privilege applies to these documents.

7. The Court recognizes that many documents in the Wrap Document contain mental impressions, conclusions, opinions, and legal theories of BOA's counsel. The Court will allow BOA to

### M

The next category is the document entitled "Corporate Job Review for Exemption Status Wrap Document," BOA 0912–1190. The plaintiff alleges that BOA has waived its privilege because a BOA employee mentioned this document in her deposition. The Court, however, concludes that the document is not subject to the attorney-client privilege because it fails the third prong of the classic test—that is, it was not created for the purposes of securing primarily legal advice.

The document's purpose recited on the second page "is to capture in detail the approach, design, and implementation of the Corporate Job Review–FLSA effort." BOA0914. Indeed, the Bank's in-house counsel says, "[t]he purpose of the Wrap Document was to provide insight for the next audit so that the process would not have to be reinvented." Affidavit of Jay J. Price, ¶ 13. Clearly, then, this document was created for a business, and not a legal, purpose. Because the document fails to satisfy the classic test, BOA cannot prevent the plaintiff from discovering them based on the attorney-client privilege.[7]

### N

The next category of communications are spreadsheets detailing the legal advice the outside and in-house counsel gave BOA regarding re-classification of certain job codes based on the responses from the questionnaire. BOA6209–6518. Apparently a team of BOA employees entered the information from the completed questionnaires into a spreadsheet format and then the Bank's counsel completed it by including their legal conclusions. Affidavit of Jay J. Price ¶ 10. The spreadsheets were distributed only to counsel and BOA employees who entered the information from the questionnaires. *Id.* at ¶ 11. Given this explanation, the court finds the attorney-client privilege applies to these documents.

redact those portions of the Wrap Document that contain such work product. *See* Fed. R. Civ. P. 26(b)(3).

## III

For the foregoing reasons, the Court finds that only a portion of the documents submitted for in camera review are privileged. Accordingly, BOA must turn over to the plaintiff those documents that are not protected by the attorney client privilege. An appropriate order shall this day issue.

The Clerk is directed to send certified copies of this Memorandum Opinion and accompanying Order to all counsel of record.