# Illinois Official Reports

## Supreme Court

---

### *Harris v. One Hope United, Inc.*, 2015 IL 117200

---

| | |
|---|---|
| Caption in Supreme Court: | ROBERT F. HARRIS, Appellee, v. ONE HOPE UNITED, INC., *et al.*, Appellants. |
| Docket No. | 117200 |
| Filed | March 19, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Eileen Brewer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Esther Joy Schwartz, Richard W. Schumacher and Jamie L. Budler, of Stellato & Schwartz, Ltd., of Chicago, for appellant. |
| | Gary W. Klages, of Law Office of Daniel E. Goodman, LLC, of Rosemont, for appellee. |
| | John F. Watson, of Craig & Craig, LLC, of Mattoon, and Craig Unrath, of Heyl, Royster, Voelker & Allen, of Peoria, for *amicus curiae* Illinois Association of Defense Trial Counsel. |
| Justices | JUSTICE KARMEIER delivered the judgment of the court, with opinion. |
| | Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Burke, and Theis concurred in the judgment and opinion. |

¶ 1      In this case, the appellant, One Hope United, Inc. (One Hope), asks us to recognize a new privilege in Illinois: a self-critical analysis privilege. We decline to do so, as we consider the matter more appropriately a subject for legislative action. Thus, we affirm the judgment of the appellate court, which similarly deferred this question of public policy to the legislature. 2013 IL App (1st) 131152, ¶ 1.

¶ 2                           BACKGROUND

¶ 3      One Hope contracts with the Illinois Department of Children and Family Services (DCFS) to provide services with the objective of keeping troubled families together. Seven-month-old Marshana Philpot died while her family participated in One Hope's "Intact Family Services" program. The Cook County public guardian (Public Guardian), acting as administrator of Marshana's estate, filed this wrongful death case to recover damages against One Hope, its employee Pixie Davis, and Marshana's mother, Lashana Philpot.

¶ 4      The complaint alleges, *inter alia*, that DCFS received a complaint about Lashana's neglect and/or abuse of Marshana. DCFS investigated the complaint and assigned the matter to One Hope. One Hope began monitoring the Philpot family for counseling services. At one point, Marshana was hospitalized for failure to thrive. When she was discharged, DCFS ordered that she live with her aunt, Marlene Parsons. Under Ms. Parsons' care, the child began to thrive. Eventually, Marshana was returned to the care of her mother. According to the complaint, the child subsequently drowned when Lashana left her unattended while bathing her. The complaint alleges that One Hope failed to protect Marshana from abuse or neglect, and should not have allowed Marshana to be returned to her mother because of her unfavorable history and her failure to complete parenting classes.

¶ 5      In the course of this litigation, attorneys for the Public Guardian deposed the executive director of One Hope, who revealed the existence of a "Priority Review" report regarding Marshana's case. According to the director, One Hope has a "continuous quality review department" which investigates cases and prepares these reports. The priority review process considers whether One Hope's services were professionally sound, identifies "gaps in service delivery" and evaluates "whether certain outcomes have been successful or unsuccessful." After One Hope refused to produce the report in response to a discovery request, the Public Guardian moved to compel its production. One Hope resisted, asserting that the report was protected from disclosure by the self-critical analysis privilege.

¶ 6      The circuit court of Cook County determined that the privilege did not apply and ordered One Hope to produce the priority review report. The court found that One Hope's refusal to produce the report after being ordered to do so was contumacious. To facilitate One Hope's request for appellate review of the privilege issue, the court found One Hope's law firm[1] in "friendly" contempt of court and fined it $1 per day. The fine order was immediately appealable under Supreme Court Rule 304(b)(5) (Ill. S. Ct. R. 304(b)(5) (eff. Feb. 26, 2010)). When a contempt order based on a discovery violation is appealed, the underlying discovery

---

[1]Although One Hope's law firm is technically the only appellant in this case, for ease of reference, we refer herein to "One Hope's" arguments rather than the "law firm's" arguments.

order is also subject to review. See *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001).

¶ 7                                    SELF-CRITICAL ANALYSIS PRIVILEGE

¶ 8         The self-critical analysis privilege appears to have originated in *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C. 1970), a medical malpractice case. In *Bredice*, the court held that a decedent's administratrix in a medical malpractice suit could not obtain discovery of the minutes and reports of a hospital staff review meeting. The court stressed that the confidentiality of the medical staff's evaluation of potential improvements in its procedures and treatments was so essential to the self-review process that allowing discovery would chill the candor required for an effective internal review. *Id.* at 250. In particular, the court recognized that the long-term public benefits of improved health care outweighed the needs of the litigant seeking discovery, and, thus, should not be sacrificed without a showing of good cause. *Id.* at 251.[2]

¶ 9         The fundamental purpose of what has come to be known as a "self-critical analysis privilege" is to protect from disclosure documents that contain candid and potentially damaging self-criticism, where disclosure of those documents would harm a significant public interest. *Scott v. City of Peoria*, 280 F.R.D. 419, 424 (C.D. Ill. 2011). Although the original purpose of the privilege was to encourage candor when parties sought to improve their own procedures in providing medical care to patients, some federal courts have relied upon the privilege in other factual settings. When expanded to other circumstances, courts generally use it to encourage activities that will protect human life or public health. *Deel v. Bank of America, N.A.*, 227 F.R.D. 456, 458 (W.D. Va. 2005). Whether the privilege applies in a particular fact situation depends in significant part on balancing the public interest furthered by self-assessment against the interest in pursuing the search for truth. *Scott*, 280 F.R.D. at 424.

¶ 10        The requisites for application of what the *Deel* court described as "this purported privilege" (*Deel*, 227 F.R.D. at 458) have been variously set out as either a three- or four-part test. In *Dowling v. American Hawaii Cruises, Inc.*, 971 F.2d 423, 425-26 (9th Cir. 1992), the Ninth Circuit Court of Appeals noted that the "generally required" elements, "if such a privilege exists," are as follow: (1) the information must result from a critical self-analysis undertaken by the party seeking protection; (2) the public must have a strong interest in preserving the free flow of the type of information sought; (3) the information must be of the type whose flow would be curtailed if discovery were allowed; and (4) the document was prepared with the expectation that it would be kept confidential and has in fact been kept confidential.

¶ 11        As the *Deel* and *Dowling* courts' comments suggest, whether the privilege should be, or has been generally, recognized in the federal courts is a matter of disagreement. As a district court has recently observed, "the Supreme Court has explicitly declined to introduce a peer-review privilege—sometimes referred to as a 'self-critical analysis' privilege—into the

---

[2]In the 1980s, our legislature recognized the desirability of a privilege in this limited context and enacted the Medical Studies Act (735 ILCS 5/8-2101 *et seq.* (West 2012)), which provides, *inter alia*, that "[s]uch information, records, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person." 735 ILCS 5/8-2102 (West 2012). As this court has stated: "The purpose of the Act is to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease." *Niven v. Siqueira*, 109 Ill. 2d 357, 366 (1985).

federal common law," a disinclination which "is consistent with the reluctance of federal courts to contravene the general rule in favor of admissibility by creating new privileges." *Williams v. City of Philadelphia*, No. 08-1979, 2014 WL 5697204, at \*3 (E.D. Pa. Nov. 4, 2014) (citing, *inter alia*, *University of Pennsylvania v. Equal Employment Opportunity Comm'n*, 493 U.S. 182, 189 (1990), *In re Grand Jury*, 103 F.3d 1140, 1150 (3d Cir. 1997), and *United States v. Nixon*, 418 U.S. 683, 710 (1974) (cautioning that privileges "are not lightly created nor expansively construed")). Lower federal courts appear to have exercised caution in this regard. See generally *Alaska Electrical Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 351 n.12 (3d Cir. 2009) ("The self-critical analysis privilege has never been recognized by this Court and we see no reason to recognize it now."); *Williams*, 2014 WL 5697204, at \*3 (rejecting a contention that "there is a 'developing trend' in the federal courts toward \*\*\* recognition" of the privilege); *Granberry v. Jet Blue Airways*, 228 F.R.D. 647, 650 (N.D. Cal. 2005) (stating that no circuit court of appeals had explicitly recognized the self-critical analysis privilege); *Union Pacific R.R. Co. v. Mower*, 219 F.3d 1069, 1076 n.7 (9th Cir. 2000) ("This court has not recognized this novel privilege."); *Medina v. County of San Diego*, No. 08cv1252, 2014 WL 4793026, at \*7 (S.D. Cal. Sept. 25, 2014) ("The Ninth Circuit does not recognize the self-critical analysis privilege."); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003) (referring to the self-critical analysis privilege as "a privilege never recognized in this circuit"). But see *Scott*, 280 F.R.D. at 423-24 (stating "[t]here can be no doubt" that the Seventh Circuit recognized the privilege in *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985)).

¶ 12                                                    ANALYSIS

¶ 13        The question before this court is whether Illinois should recognize the self-critical analysis privilege. The parties agree that a *de novo* standard of review applies. Indeed, the applicability of a discovery privilege is a matter of law (*Niven*, 109 Ill. 2d at 368) and rulings with respect thereto are subject to *de novo* review. *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 27; *Norskog*, 197 Ill. 2d at 71.

¶ 14        Our appellate court has been asked to consider recognition of the self-critical analysis privilege in at least three different contexts, including the case now before us: *People v. Campobello*, 348 Ill. App. 3d 619 (2004); *Rockford Police Benevolent & Protective Ass'n v. Morrissey*, 398 Ill. App. 3d 145 (2010); 2013 IL App (1st) 131152. In each instance, the appellate court declined to recognize the prospective privilege.

¶ 15        The question arose in *Campobello* in the course of a criminal prosecution of a priest for the alleged molestation of a young girl. The Roman Catholic Diocese of Rockford (Diocese) was served with discovery requests by the State and refused to comply. Among the items sought were the Diocese's investigative records. The Diocese urged the trial court to recognize a "critical self-analysis" privilege under Illinois law and rule that the privilege protected those records from disclosure. *Campobello*, 348 Ill. App. 3d at 625. The circuit court rejected the argument that the records of the internal investigation of the defendant were protected by a "critical self-analysis" privilege and ordered them produced. *Id*. The Diocese respectfully requested a contempt order to facilitate an appeal, and the circuit court complied.

¶ 16        In the ensuing appeal, wherein other matters were also raised and addressed, the appellate court "decline[d] to consider whether the [self-critical analysis] privilege should be made part

of Illinois law." *Id*. at 637. The court noted the Diocese's concession that the privilege has never been recognized in Illinois common law. The court found the "closest statutory analogue" to be section 8-2101 of the Medical Studies Act (735 ILCS 5/8-2101 (West 2002)), which protects, against discovery, hospital documents related to internal quality control. The appellate court acknowledged the Diocese's argument that its misconduct officer and intervention committee records were the product of an analogous function and should thus be protected from disclosure as well; however, the appellate court concluded: "Whatever the force of this reasoning, it does not warrant an exercise in 'judicial legislation' [citation]. The privilege that the Diocese would have us recognize implicates competing public policy considerations that are best weighed by the General Assembly." *Campobello*, 348 Ill. App. 3d at 637 (citing *People ex rel. Birkett v. City of Chicago*, 184 Ill. 2d 521 (1998)).

¶ 17    More recently, the appellate court, in *Rockford*, considered the question of privilege recognition in the context of a request for disclosure under the Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2006)). In *Rockford*, the plaintiff, pursuant to the provisions of the FOIA, sought, *inter alia*, production of a survey conducted by Rockford College at the behest of the Rockford police department. The defendants, including the police department, represented that the purpose of the survey was to assess the department's performance, and was thus exempt from disclosure pursuant to "the self-critical analysis privilege as developed under the federal common law." *Rockford*, 398 Ill. App. 3d at 148. The circuit court rejected that contention, ruling that "the survey was not exempt from disclosure either as an audit or pursuant to the self-critical analysis privilege, or any other privilege." *Id*. at 149.

¶ 18    On appeal, defendants argued multiple bases for exemption of records requested, among them, applicability of a self-critical analysis privilege to the survey sought in discovery. In rejecting defendants' claim of privilege, the appellate court first noted that "[a] self-critical analysis exemption is not to be found among the enumerated exemptions" in the FOIA, and the court declined to read such an exemption into the Act. *Id*. at 152. Second, the appellate court observed that the self-critical analysis privilege has not been adopted by Illinois courts. The appellate court reiterated the general principle that "privileges are disfavored because they are in derogation of the search for truth" and quoted from *Birkett*, where this court stated that " 'the extension of an existing privilege or establishment of a new one is a matter best deferred to the legislature.' " *Id*. at 153 (quoting *Birkett*, 184 Ill. 2d at 528). Third, the appellate court noted that the federal cases cited by defendants are not binding upon state courts and, in any event, the Illinois version of the FOIA differed from the federal version. *Id*. Finally, the appellate court in *Rockford*, like the court in *Campobello*, rejected an argument that a self-critical analysis privilege of broader application should be recognized based upon an analogous statutory privilege created by the legislature in the Medical Studies Act. The appellate court observed that the legislature "easily could have codified the [privilege] into the FOIA, had it chosen to do so," and "[t]he privilege's presence in the Medical Studies Act juxtaposed against its absence in the FOIA strongly supports the opposite of defendants' argument—that the legislature deliberately omitted the privilege from the FOIA." *Id*. at 153-54.

¶ 19    Recognition of a self-critical analysis privilege was most recently considered, and rejected, by the appellate court in the case *sub judice*. The appellate court first acknowledged that "[s]ome federal courts" have recognized a self-critical analysis privilege, which, "on the federal level is created only by case law and not by federal statutes or specific court rules."

2013 IL App (1st) 131152, ¶¶ 1, 11. The appellate court observed: "The parties do not dispute that the self-critical analysis privilege has never been definitively established by any Illinois statute, court rule, or prior state case law." *Id*. ¶ 8. The appellate court noted that appellate panels in *Rockford* and *Campobello* had considered recognition of the privilege, "albeit in somewhat different contexts," and had declined to recognize it. *Id*. ¶¶ 14-15.

¶ 20    Like the courts in *Rockford* and *Campobello*, the appellate court in this case relied upon this court's decision in *Birkett*, in this instance, for the propositions that: (1) privileges against disclosure are strongly disfavored because they operate to exclude relevant evidence and thus work against the truthseeking function of legal proceedings; (2) privileges should not be applied unless they promote sufficiently important interests to outweigh the need for probative evidence; and (3) the extension of an existing privilege or establishment of a new one is a matter best deferred to the legislature. *Id*. ¶ 13 (citing *Birkett*, 184 Ill. 2d at 527-28).

¶ 21    Having acknowledged those principles of general application, the appellate court then considered two of defendants' arguments specific to this case: (1) that shielding self-critical documents would further the purposes of the Child Death Review Team Act (20 ILCS 515/1 *et seq.* (West 2012)); and (2) that the impetus behind the statutory privilege afforded by the Medical Studies Act (735 ILCS 5/8-2101 (West 2012)) warrants judicial extension of an analogous privilege in this context. The appellate court rejected both arguments.

¶ 22    In the first instance, the court found that "a close review of the [Child Death Review Team] Act reveals that it encourages, rather than discourages, disclosure of information of the sort sought here." 2013 IL App (1st) 131152, ¶ 16. "Additionally, the Act specifically states that '[a]ccess to information regarding deceased children by *** multidisciplinary and multiagency child death review teams is necessary for those teams to achieve their purposes and duties.' " *Id*. (quoting 20 ILCS 515/5(7) (West 2012)). The appellate court determined that the overriding need to determine the truth with respect to the cause of death of an infant overrides the desire of One Hope to keep its self-evaluations confidential. *Id*. ¶ 17.

¶ 23    With respect to One Hope's second argument, the appellate court pointed out that the Medical Studies Act, by its very terms, does not apply to institutions such as One Hope. Moreover, the appellate court observed that the *Rockford* court "declined a similar invitation to adopt the Medical Studies Act privilege to disclosure required by other statutes by analogy." *Id*. ¶ 18.

¶ 24    The appellate court concluded while neither *Campobello* nor *Rockford* is squarely on point, their analyses nonetheless provided substantial support to the court's determination that the self-critical analysis privilege is not recognized in Illinois. *Id*. "Absent the privilege, there is no dispute that the priority review report is *discoverable*, as it may contain information admissible at trial *or lead to such information*." (Emphases added.) *Id*. ¶ 19. The appellate court thus affirmed the circuit court's order compelling production of the priority review report and vacated the contempt order, acknowledging that the failure to comply with the circuit court's order involved a "good faith" effort "to secure appellate interpretation of this rather novel issue." *Id*. ¶ 20.

¶ 25    We now turn to *Birkett*, the oft-cited opinion in the state appellate court decisions that have declined to recognize the self-critical analysis privilege. In *Birkett*, this court was asked to adopt a common law "deliberative process privilege" to exempt from discovery confidential advice given to those involved in making decisions and policy for state and local government.

*Birkett*, 184 Ill. 2d at 526. Unlike the privilege here at issue, which, at best, can be said to have gained a foothold in the federal courts, this court in *Birkett* observed that the deliberative process privilege was "[w]idely recognized in the federal courts." *Id.* The rationale for the deliberative process privilege bears some similarity to that offered for the self-critical analysis privilege in that, in both instances, the idea is to foster candor and a frank exchange of opinion for decisional or remedial purposes. See *id.* at 527.

¶ 26    Having acknowledged the rationale underpinning the deliberative process privilege, this court nonetheless hastened to add that "privileges are strongly disfavored because they operate to 'exclude relevant evidence and thus work against the truthseeking function of legal proceedings.' " *Id.* (quoting *People v. Sanders*, 99 Ill. 2d 262, 270 (1983)). This court noted that the decision to create a privilege or extend an existing one involves a determination that the privilege promotes sufficiently important interests to outweigh the need for probative evidence, a determination that is best deferred to the legislature. *Id.* at 528 (citing, *inter alia*, *Illinois Educational Labor Relations Board v. Homer Community Consolidated School District No. 208*, 132 Ill. 2d 29, 34 (1989), and *Sanders*, 99 Ill. 2d at 269 (recognizing that the great majority of privileges recognized in Illinois are statutory creations)).

¶ 27    Although this court in *Birkett* recognized that the creation of a new privilege in Illinois is "presumptively a legislative task," the court acknowledged that "*Homer* allows for a court's recognition of an evidentiary privilege, in 'rare instances,' where each of the following conditions are met: (1) the communications originated in a *confidence* that they will not be disclosed; (2) this element of *confidentiality is essential* to the full and satisfactory maintenance of the relation between the parties; (3) the *relation* must be one which in the opinion of the community ought to be sedulously *fostered*; and (4) the *injury* that would inure to the relation by disclosure would be *greater than the benefit* thereby gained for the correct disposal of litigation." (Emphases in original.) *Id.* at 533 (citing *Homer*, 132 Ill. 2d at 35). In *Birkett*, this court disposed of the proponent's argument based on its failure to establish the first element of the test. *Id.* at 534.

¶ 28    In *Homer*, where this court *did* recognize a qualified privilege protecting the strategy deliberations of school boards and teachers' unions engaged in collective bargaining from disclosure, the court nonetheless began its analysis with this cautionary quotation from *Sanders*:

> " 'The expansion of existing testimonial privileges and acceptance of new ones involves a balancing of public policies which should be left to the legislature. A compelling reason is that while courts, as institutions, find it easy to perceive value in public policies such as those favoring the admission of all relevant and reliable evidence which directly assist the judicial function of ascertaining the truth, it is not their primary function to promote policies aimed at broader social goals more distantly related to the judiciary. This is primarily the responsibility of the legislature. To the extent that such policies conflict with truthseeking or other values central to the judicial task, the balance that courts draw might not reflect the choice the legislature would make.' " *Homer*, 132 Ill. 2d at 34 (quoting *Sanders*, 99 Ill. 2d at 271).

¶ 29    Thereafter, the court readily found three of the four conditions for recognition of a privilege met and proceeded to consider the fourth. *Id.* at 35-36. In that part of its analysis, this court first addressed an issue raised by the parties in the lower courts: "whether the General

- 7 -

Assembly created a statutory privilege for collective-bargaining matters discussed at closed school board meetings by exempting these matters from the Open Meetings Act (Ill. Rev. Stat. 1987, ch. 102, par. 41 *et seq.*) and the Freedom of Information Act (Ill. Rev. Stat. 1987, ch. 116, par. 201 *et seq.*)." *Id*. at 36. This court stated it was unclear from the language of the acts that the General Assembly intended those statutes to create a statutory privilege; however, the court believed the statutory language *was* "indicative of a legislative intent that collective-bargaining strategy sessions be kept confidential." *Id*. at 37. Expressing concern that a statutory privilege based on those two acts "would apply only to governmental bodies (here, the school district) and would not prohibit union strategy meetings from being discovered," the court "decline[d] to base any privilege *solely* on these statutes, but instead view[ed] these acts as evidence of a public policy favoring confidentiality in collective-bargaining strategy." (Emphasis added.) *Id*.

¶ 30  Looking elsewhere for indicia of legislative intent, the court next turned to the Illinois Educational Labor Relations Act (Ill. Rev. Stat. 1987, ch. 48, ¶ 1701 *et seq.*). The court found support for recognition of a privilege in section 2(n) of the Act, which prevented employees who may have knowledge of, or access to, school board collective-bargaining strategy from joining labor organizations. That prohibition, the court reasoned, evinced legislative intent to protect educational employers from premature disclosure of their bargaining proposals and labor relations policies that could undermine their bargaining strategies, an intent that "would obviously be frustrated if labor organizations were allowed to obtain that same information through discovery." *Homer*, 132 Ill. 2d at 38.

¶ 31  Finally, the court turned to federal labor law and found there, too, a policy of preserving the confidentiality necessary to effective collective bargaining. *Id*. at 38-39.

¶ 32  Based upon its examination of pertinent legislative and administrative action, this court concluded that "there exists a strong public policy protecting the confidentiality of labor-negotiating strategy sessions" and, on that basis, found that policy sufficiently satisfied the fourth element of the four-prong test. *Id*. at 39-40. This court thus held "some type of privilege is necessary to prevent disclosure of either party's negotiating strategy during an unfair labor practice proceeding before the Illinois Educational Labor Relations Board." *Id*. at 40.

¶ 33  We find *Birkett* and *Homer* instructive insofar as they counsel, in the first instance, against judicial infringement upon what is principally a policymaking decision for the legislature, and in the second, for consideration of legislative enactments that *are* in place before deciding whether expressions of public policy therein warrant a "rare" exercise of judicial authority in furtherance thereof. See *Birkett*, 184 Ill. 2d at 533 ("the creation of a new privilege is presumptively a legislative task" and this court acts to recognize a new privilege only in "rare instances").

¶ 34  In the appellate court, One Hope argued the relevance of two legislative acts: the Child Death Review Team Act (20 ILCS 515/1 *et seq.* (West 2012)) and the Medical Studies Act (735 ILCS 5/8-2101 (West 2012)). We find these acts significant in ascertaining legislative intent. See *Homer*, 132 Ill. 2d at 36-40 (examining, *inter alia*, the provisions of Illinois's Open Meetings Act, the Freedom of Information Act, and the Educational Labor Relations Act before concluding "that there exists a strong public policy protecting the confidentiality of labor-negotiating strategy sessions").

¶ 35    First, we find the *Rockford* court's reasoning sound and applicable in this context as well. In *Rockford*, the appellate court rejected defendants' invitation to create a self-critical analysis privilege in relation to the FOIA, stating:

> "The fact that the legislature codified this privilege in relation to the internal quality control of medical institutions means that the legislature easily could have codified the provision into the FOIA, had it chosen to do so. The privilege's presence in the Medical Studies Act juxtaposed against its absence in the FOIA strongly supports the opposite of defendants' argument—that the legislature deliberately omitted the privilege from the FOIA and we should not engraft it into the FOIA." *Rockford*, 398 Ill. App. 3d at 153-54.

As the appellate court in this case pointedly observed, "by its very terms, [the Medical Studies Act] does not apply to institutions such as One Hope." 2013 IL App (1st) 131152, ¶ 18.

¶ 36    Obviously, the legislature could have extended this quality control privilege to myriad scenarios involving all kinds of entities, public and private, based upon the rationale that internal review might benefit others using those services or products in the future. However, the legislature's approach has been targeted and narrow. This, we believe, evinces a legislative intent to limit, rather than expand, the scope of the privilege.

¶ 37    With respect to the specific circumstances before us, further support for this conclusion can be found in the Child Death Review Team Act. The stated policy of the Act, as set forth in subsection (3) of section 5, underscores the need for "an accurate and complete determination of the cause of death" as well as "the development and implementation of measures to prevent future deaths from similar causes." 20 ILCS 515/5(3) (West 2012). To that end, the legislature has determined that "[a]ccess to information regarding deceased children and their families by multidisciplinary and multiagency child death review teams is necessary for those teams to achieve their purposes and duties." 20 ILCS 515/5(7) (West 2012). Though section 30(b) of the Act limits public access to information, specifying that "[r]ecords and information provided to a child death review team and the Executive Council, and records maintained by a team or the Executive Council, are confidential and not subject to the Freedom of Information Act ***, as provided in that Act," this subsection contains an important exemption:

> "Nothing contained in this subsection (b) prevents the sharing or disclosure of records, other than those *produced by* a Child Death Review Team or the Executive Council, relating or pertaining to the death of a minor under the care of or receiving services from the Department of Children and Family Services and under the jurisdiction of the juvenile court with the juvenile court, the State's Attorney, *and the minor's attorney.*" (Emphases added.) 20 ILCS 515/30(b) (West 2012).

Thus, subsection (b) of section 30 limits *public access* to records *provided to* child death teams, and protects, to an even greater degree, records *produced by* a Child Death Review Team or the Executive Council. However, when a child dies who was under the care of, or receiving services from, DCFS and under the jurisdiction of the juvenile court, disclosure of records, other than those produced by the Child Death Review Team or the Executive Council, is permissible *to the minor's attorney*.

¶ 38    We read this statutory provision as further, and clearer, evidence that the legislature did not intend to expand any existing quality control privilege to the circumstances before us in this case. DCFS was ultimately responsible for Marshana's care and well-being; One Hope was, by

assignment, an extension of DCFS. With the exception of those records actually produced by the Child Death Review Team or Executive Council, all other records pertinent to the child's death are subject to disclosure to the minor's attorney. The records at issue in this case address the circumstances of Marshana's death and the services that were provided by One Hope. Subsection (b) obviously envisions the use of records in potential prosecution and litigation after a child's death as it addresses and allows for disclosure of information to both the prosecutor and the minor's attorney.

¶ 39                                           CONCLUSION

¶ 40        We conclude that relevant legislative acts and omissions evince a public policy determination by the General Assembly that the type of information sought in discovery here is not subject to a "self-critical analysis privilege" that would protect it from disclosure. As the appellate court concluded: "Absent the privilege, there is no dispute that the priority review report is discoverable, as it may contain information admissible at trial or lead to such information." 2013 IL App (1st) 131152, ¶ 19.

¶ 41        For the reasons stated, we affirm the judgment of the appellate court, including its vacation of the contempt order.

¶ 42        Affirmed.